# Exhibit 2

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------x

ENDO PHARMACEUTICALS, INC.,

              Plaintiff,

          v.                          13 Civ. 3288 (TPG)

ROXANE LABORATORIES, INC.,

              Defendant.

-----------------------------x
                                      New York, N.Y.
                                      September 10, 2014
                                      11:50 a.m.


Before:

                  HON. THOMAS P. GRIESA,

                                      District Judge


                      APPEARANCES

DUANE MORRIS
     Attorneys for Johnson Matthey, Inc.
BY:  SUZAN JO

LOCKE LORD
     Attorneys for Defendant
BY:  KEITH PAR
     WASIM K. BLEIBEL
     ALAN CLEMENT
```

1          (Case called)

2          THE COURT:  Who wants to speak for the motion?

3          MS. JO:  Good morning, your Honor, my name is Suzan

4   Jo.  I'm from the law firm of Duane Morris and I will speak on

5   behalf of the subpoena recipient --

6          THE COURT:  Who is your client?

7          MS. JO:  Johnson Matthey, Inc., the subpoena

8   recipient.

9          THE COURT:  Go back to the lecturn.

10          And you represent whom?

11          MS. JO:  Johnson Matthey, Inc.  That is the party that

12   received the third-party subpoena from Roxane and it is our

13   motion to quash the subpoena.

14          THE COURT:  You go ahead.

15          MS. JO:  Your Honor, Johnson Mathey is a third party

16   to the litigation that is currently pending before your Honor.

17   Johnson Mathey back in 2012 sold one of its patents to Endo

18   Pharmaceuticals, which is the plaintiff in the case in chief,

19   and the subpoena that was received by us sought documents and

20   depositions regarding the transaction, which is the sale of the

21   patent itself and also relates to a supply agreement which is

22   between Johnson Mathey and Roxane.  Our argument is basically

23   that nothing that is in the --

24          THE COURT:  Your argument is what?

25          MS. JO:  Is that the documents that are sought have no

1  relationship whatsoever to the case that's pending before the

2  Court, nor any of the affirmative defenses or the

3  counterclaims.

4          THE COURT:  What does the other side say?

5          MR. PAR:  Your Honor, Keith Par on behalf of Roxane.

6          THE COURT:  If you can go back to the lecturn.

7          I will go back to you, Ms. Jo, in just a minute.

8          MR. PAR:  Good morning, your Honor, Keith Par on

9  behalf of Roxane Laboratories.

10          Roxane Laboratories has a relationship with Johnson

11 Mathey.  We have a supply agreement that was entered into in

12 2009 with Johnson Mathey.  And then in March of 2012, we were

13 approached by Johnson Mathey to amend that supply agreement,

14 which occurred --

15          THE COURT:  The earlier agreement did what?

16          MR. PAR:  The amendment or the supply agreement?

17          THE COURT:  The supply agreement.

18          MR. PAR:  The supply agreement was an agreement under

19 which Roxane would purchase its active pharmaceutical

20 ingredient from Johnson Mathey for use in its ANDA product and

21 that agreement still exists.

22          The amendment that was proposed by Johnson Mathey in

23 2012 was entered into.  We did not know this at the time.  But

24 a day later, on March 21, 2012, Johnson Mathey sold what they

25 refer to in their patent purchase agreement as the patent

1    assets, which included the '482 patent.  Thereafter, Endo, as

2    the acquirer of that patent, sued Roxane, alleging infringement

3    of that patent.  Roxane in its answer then asserted a license

4    defense because we have a right --

5            THE COURT:  Can we step back.

6            MR. PAR:  Yes.

7            I'm sorry.  Asserted a license defense to the claim of

8    infringement.  And that license defense is based -- it's an

9    implied license from the purchase of the API from Johnson

10   Mathey which had the rights to sell the API to Roxane.

11           THE COURT:  You are going a little fast for me.

12           MR. PAR:  We had the right to purchase API, active

13   pharmaceutical ingredient, for use in our ANDA product.

14           THE COURT:  We being?

15           MR. PAR:  We, Roxane, had the right to purchase from

16   Johnson Mathey the active pharmaceutical ingredient needed for

17   its ANDA product, for Roxane's ANDA products.

18           Endo, after acquiring the patent, sued Roxane,

19   alleging infringement.

20           THE COURT:  Wait a minute.  Who owned the active

21   ingredient?

22           MR. PAR:  At the time that the supply agreement was

23   entered into, JM, Johnson Mathey, had the right to manufacture

24   that and to sell to Roxane.

25           THE COURT:  JM had the rights to the active

1    ingredient, right?

2            MR. PAR:  Yes.  And JM is the company that applied for

3    the patent that ultimately issued as the '482 patent.

4            THE COURT:  So JM had the rights to that and applied

5    for the patent.

6            MR. PAR:  Yes.

7            THE COURT:  Let me just make a note.  I think I've got

8    it.  They owned the technology?

9            MR. PAR:  Yes.

10           THE COURT:  And then they applied for a patent?

11           MR. PAR:  Yes.

12           THE COURT:  Was the patent granted?

13           MR. PAR:  Yes, it was, your Honor.

14           THE COURT:  And what is it, the '48 --

15           MR. PAR:  It's the '482 patent.

16           THE COURT:  And when was that granted?

17           MR. PAR:  I don't know the specific date, your Honor.

18   I am sure it's in the record as to the date.  It was issued on

19   the face of the patent.  I know it's attached to Endo's

20   complaint.  It would have been --

21           THE COURT:  I don't have to have that.

22           MR. PAR:  It's December 12 of 2010.

23           THE COURT:  They got the patent and then what

24   happened?

25           MR. PAR:  And then in 2012, March 12 of 2012, JM

1   approached Roxane and asked for an amendment to that supply

2   agreement.

3          THE COURT:  Just a second.  JM.  I'm missing

4   something.  When did Roxane come into the picture?

5          MR. PAR:  Roxane was in the picture with Johnson

6   Mathey back in September of 2009.  That is when the supply

7   agreement was first entered into.  Actually, there was an

8   earlier relationship.  There was a confidentiality agreement

9   that was dated back to 2005.

10         THE COURT:  And JM supplied the technology?

11         MR. PAR:  It was committed by the agreement to supply

12  the active ingredient, the finished product --

13         THE COURT:  Supplied the active ingredient to Roxane?

14         MR. PAR:  To Roxane, yes.

15         THE COURT:  So JM owned the active ingredient.

16         MR. PAR:  Yes.

17         THE COURT:  JM was supplying the active ingredient to

18  Roxane.

19         MR. PAR:  It had a commitment to supply it.  We

20  obviously weren't on the market yet because we were under

21  litigation from Endo in the first set of patents, but we were

22  not on the market yet.  But they had a commitment, a

23  contractual obligation to supply that product.  That's correct.

24         THE COURT:  Contract to supply?

25         MR. PAR:  That's correct.

1          THE COURT:  And then JM gets a patent.

2          MR. PAR:  They received a patent, yes.

3          THE COURT:  And then I know you've been through this.

4    Again, what happened after that?

5          MR. PAR:  And then they approached --

6          THE COURT:  Who is they?

7          MR. PAR:  They, being JM, approached Roxane and asked

8    for an amendment to the supply agreement.

9          THE COURT:  Just a minute.  JM approached Roxane and

10   asked for what?

11         MR. PAR:  An amendment to the supply agreement.

12         THE COURT:  Doing what?

13         MR. PAR:  The amendment restricted and limited

14   Roxane's rights to use the API only for the subject of its then

15   currently pending abbreviated new drug application; in other

16   words, NDIR, in the immediate release version as well.

17         THE COURT:  I'm not with you.  They approached Roxane

18   and asked for what again?

19         MR. PAR:  They asked for an amendment that would

20   restrict the scope of the supply agreement.

21         THE COURT:  Restrict what?

22         MR. PAR:  The scope of the supply agreement so that

23   Roxane would only be able to use the API in its immediate

24   release version and in its original formulation extended

25   release version that it then had an ANDA pending on.

1          THE COURT:  What was the significance of all of that?

2          MR. PAR:  Well, there are these additional patents

3     that have the Grunenthal patents that Endo is now asserting

4     against other parties that have filed a crush-resistant

5     formulation ANDA.  There are those patents that are related to

6     that.  And it's our belief that Endo did not want JM to supply

7     Roxane with any active pharmaceutical ingredient that could be

8     used for a crush-resistant formulation.  But having said that,

9     Roxane does not have pending an ANDA for a crushed-resistant

10    formulation.

11         THE COURT:  They don't have pending of what?

12         MR. PAR:  We do not have a pending abbreviated new

13    drug application for a crush-resistant or tamper-resistant

14    formulation.  We just have an ANDA that's pending for --

15         THE COURT:  What is an ANDA?

16         MR. PAR:  The abbreviated new drug application with

17    the FDA.

18         THE COURT:  With the FDA?

19         MR. PAR:  With the FDA.

20         Essentially what they were doing in that amendment is

21    trying to limit the scope of what JM would supply to Roxane,

22    and Roxane only had a pending abbreviated new drug application

23    to seek approval for the sale of a version that was -- the

24    original version; in other words, not the crush resistant

25    formulation.  So Roxane entered into that agreement with JM,

1    Johnson Mathey, the amendment to the supply agreement.

2              THE COURT:  JM entered into the agreement with whom?

3              MR. PAR:  With Roxane.  The amendment to the supply

4    agreement.

5              THE COURT:  And then what happened?

6              MR. PAR:  The very next day, March 21 of 2012, Johnson

7    Mathey sold its patent assets, including the '482 patent, to

8    Endo.

9              THE COURT:  Who sold?

10             MR. PAR:  Johnson Mathey sold to Endo the '482 patent.

11             THE COURT:  Why did that happen the next day?

12             MR. PAR:  We have learned in discovery -- let me just

13   preface this by saying that much of what we have learned in

14   discovery we have learned from Endo and it's subject to the

15   protective order that's entered in this case.  But we have

16   learned that there were communications between Endo and Johnson

17   Mathey relating to our agreements, our supply agreement in the

18   First Amendment.

19             Why did they do it?  I think those are questions that

20   we would like answered ourselves from Johnson Mathey and from

21   Endo.  But we do know what happened thereafter.  And what

22   happened thereafter is Endo, after purchasing the '482 patent,

23   sued Roxane alleging infringement of that patent.  So Roxane is

24   being sued on a patent that was obtained by Johnson Mathey,

25   sold by Johnson Mathey --

1          THE  COURT:    You  represent  --

2          MR.  PAR:    Roxane.    And  for  the  record,  let  me  just  say

3    that  Endo  is  not  here  at  the  hearing  today.    They  are  not

4    present  here  at  the  hearing  today.    I  just  wanted  to  make  that

5    clear.    I  don't  know  why  they  are  not  present,  but  they  are  not

6    here.

7          THE  COURT:    You  served  the  subpoena?

8          MR.  PAR:    We  served  the  subpoena  on  Johnson  Mathey.

9    And  what  we  have  asked  for  is  a  full,  unredacted  version  of  the

10   patent  purchase  agreement  pursuant  to  which  the  patent  was  sold

11   by  Johnson  Mathey  to  Endo.    And  that  document  is  the  document

12   that  Endo  is  relying  on  to  prove  that  it  has  title  to  the  '482

13   patent.    But  the  original,  fully  or  complete  unredacted  version

14   has  never  been  produced  to  Roxane.

15          Essentially,  we  are  being  sued  on  a  patent  that  was

16   purchased  by  Endo  and  neither  Endo  nor  Johnson  Mathey  will  give

17   us  the  full,  unredacted  copy  of  the  patent  purchase  agreement

18   under  which  the  rights  were  supposedly  transferred  or  allegedly

19   transferred.

20          THE  COURT:    What  do  you  think  is  sort  of  lurking

21   there?    What  are  you  suspicious  of?

22          MR.  PAR:    We  know  in  Section  3.2  of  the  agreement,

23   from  a  title  heading,  that  there  is  a  grant-back  license.    We

24   also  know,  from  the  index  or  actually  the  definition  sections,

25   that  there  are  a  number  of  terms  that  are  defined  in  the

1   section that's redacted.

2           One term, for instance, is existing contract term in

3   Section 1.17 of the agreement.  It says:  Has the meaning set

4   forth in Section 3.2A(iii).  And when you look at Section

5   3.2(iii), you can't see it because it's redacted.  So we don't

6   know what that provision says and we need to know what that

7   provision says because we are being accused of infringement for

8   a patent that has purchased by Endo from a company that we had

9   a supply agreement with and still have a supply agreement.  And

10  we have tried to work this out with Johnson Mathey.

11          It's never been clear to us and we do not understand

12  why Johnson Mathey doesn't want to supply to its customer a

13  document that would help its customer get on the market.  And

14  the answer to that question must be that there is something

15  valuable or something in this patent purchase agreement that

16  gives Johnson Mathey rights that are greater than the rights or

17  the value that they would get by honoring their commitment to

18  supply us with product.  And we don't know --

19          THE COURT:  I'm not following you now at all.

20          MR. PAR:  We are being sued.  We have a licensed

21  defense.  In Johnson Matthey's papers seeking to quash the

22  subpoena they have said, well, if you have a licensed defense,

23  then you already have the supply agreement and you already have

24  the first amendment to the supply agreement.  That should be

25  enough.

Page 12

1          Well, I will tell you, your Honor, that we have those

2    documents, yes.  But also Endo has those documents and

3    apparently they don't mean anything to Endo or there is

4    something in this agreement that Endo thinks somewhat trumps

5    that or overweighs it because Endo is still suing us under the

6    '482 patent.

7          You may recall a year ago, it was actually not quite a

8    year ago, September 12, we had the preliminary injunction

9    hearing.  And at that hearing Endo did not bring the '482

10   patent against Roxane.  In other words, they did not pursue

11   that patent against Roxane.  They pursued it against Actavis,

12   but not against Roxane.  And we thought and we have thought

13   that they would potentially dismiss that patent against Roxane

14   as the litigation progressed.  But as late at last week we

15   received a letter from Endo saying that they are asserting

16   claim 4 of the '482 patent against Roxane.

17         And we need this document, the patent purchase

18   agreement, with this grant-back license provision so that we

19   can look at it and we can develop a defense.  Johnson Mathey

20   says, we should have a defense to the patent based on our

21   supply agreement and our first amendment.  But Endo obviously

22   isn't honoring that.  And we need to know why.  Because it

23   doesn't make sense to us.

24         THE COURT:  Who obtained, originally obtained the '482

25   patent?

1            MR. PAR:  Johnson Mathey.

2            THE COURT:  This was at a time when Johnson Mathey was

3    supplying this active ingredient to Roxane, right?

4            MR. PAR:  It had certainly had an obligation to

5    supply, yes.  I don't know how much was being supplied there

6    for -- they had an obligation as of September 2009, yes.

7            THE COURT:  In other words, it was contemplated that

8    this would be done.

9            MR. PAR:  That's right.

10           THE COURT:  If things cleared?

11           MR. PAR:  That's right.

12           THE COURT:  So JM was going to supply the active

13   ingredient to Roxane?

14           MR. PAR:  Yes.

15           THE COURT:  And as of that time there was no patent.

16           MR. PAR:  The patent was in application at that time.

17           THE COURT:  JM got a patent.

18           MR. PAR:  Yes.

19           THE COURT:  December 12, 2010.  So JM now has a

20   patent.

21           MR. PAR:  They sold the patent to Endo in March of

22   2012, the day after --

23           THE COURT:  You're getting ahead.  JM got the patent.

24   They have been selling the active ingredient to Roxane.  They

25   got the patent.  Now, did they stop selling the active

Page 14

1    ingredient to Roxane?

2             MR. PAR:  We have not got on the market yet.  The IR

3    product they are still selling.  Yes, they are still selling as

4    active for the IR product.

5             THE COURT:  Say that again.

6             MR. PAR:  There is an immediate-release version of the

7    drug and they are selling us the active ingredient --

8             THE COURT:  In other words, JM is dealing with Roxane.

9             MR. PAR:  Yes.  We have an existing contractual

10   relationship with them to this day.

11            THE COURT:  And then JM got a patent.

12            MR. PAR:  Yes.

13            THE COURT:  Now they decide to deal with Endo.

14            MR. PAR:  Yes.

15            THE COURT:  What is Endo trying to prevent Roxane from

16   doing?

17            MR. PAR:  They are trying to prohibit us, enjoin us

18   from selling any product.  They are asserting patent

19   infringement against us.

20            THE COURT:  Selling what?

21            MR. PAR:  They are asserting patent infringement

22   allegations against us based on claim 4 of the '482 patent.

23            THE COURT:  Which is crush resistant?

24            MR. PAR:  No.  The '482 is the low ABUK patent.

25            THE COURT:  The what?

1          MR. PAR:  The low ABUK patent, low level.

2          THE COURT:  Now you have served a subpoena.

3          MR. PAR:  Yes.

4          THE COURT:  And you seek what in the subpoena?

5          MR. PAR:  And we seek in the subpoena the production

6   of the full, unredacted version of the patent purchase

7   agreement which has that grant-back license in it.  We also

8   seek testimony and documents relating to the communications

9   between Roxane and Endo relating to how our amendment was

10  instigated, who implemented that, who was involved, and coming

11  to Roxane and proposing the amendment in March of 2012, who was

12  involved in the purchase of that patent and what were the terms

13  under which -- all the terms under which it was purchased.

14          Even the section of the patent purchase agreement that

15  has the heading transfer of patent assets has a clause that

16  refers back to Section 3.2D, which is a part of the document

17  that's unredacted.  So even for purposes of Endo proving that

18  they have rights in this patent to assert against someone, we

19  need the full document to know what the full scope of those

20  rights are, whether there is a limitation on those rights,

21  whether there is a limitation that's specific as to Roxane,

22  which we believe there is, and whether there is perhaps a

23  reversion interest.  We don't know what the other terms of this

24  patent purchase agreement is.

25          And if you think about this, and maybe this analogy

```
 1    isn't the best, let's say we have to prove that we own land and

 2    there is a deed that is the item that we need to use to prove

 3    that we own land.  And if part of that deed is stricken out or

 4    redacted, how can you prove that you actually own the land.

 5    That's the same thing about this patent purchase agreement.

 6    They have said that they have title to this patent that they

 7    are suing us on based on this agreement, but then neither Endo

 8    nor Johnson Mathey will give us a copy of the full agreement.

 9              THE COURT:  Say the latter again.  Repeat that.

10              MR. PAR:  They are suing us for patent infringement

11    based on the '482 patent, and they are claiming that they have

12    rights under the patent purchase agreement, but neither Endo

13    nor Johnson Mathey will give us a full copy of the patent

14    purchase agreement pursuant to which they supposedly had those

15    rights.  If you were trying the case --

16              THE COURT:  In other words, they acquired the patent.

17    They didn't obtain the patent; they acquired it.

18              MR. PAR:  That's right.

19              THE COURT:  They bought it from JM.

20              MR. PAR:  That's right.

21              THE COURT:  What you are seeking to know is under what

22    terms that was bought.

23              MR. PAR:  Yes.  That's absolutely right.

24              THE COURT:  Let's hear from the other side.  And you

25    represent.
```

1          MS. JO:  I represent Johnson Matthey, not Endo, but

2   Johnson Matthey.  I have not spoken with counsel for Endo with

3   respect to the subpoena whatsoever.

4          Johnson Matthey has no interest in the litigation that

5   is currently between Endo and Roxane.  Johnson Matthey sold the

6   '482 patent to Endo in 2012.  As part of that sale they did

7   seek an amendment to the existing supply agreement that JM had

8   with Roxane, and Roxane agreed to the amendment to the

9   agreement.  So the supply agreement as exists between JM and

10  Roxane contains the amendment that went into effect in March of

11  2012.

12          THE COURT:  Contains the what?

13          MS. JO:  The amendment.  So there is a supply

14  agreement and there is an amendment to the supply agreement.

15  The two documents together is the effective supply agreement

16  right now.

17          THE COURT:  And that supply agreement is between whom

18  and whom?

19          MS. JO:  JM and Roxane.

20          THE COURT:  Roxane is being sued for patent

21  infringement, right?

22          MS. JO:  Correct.  By Endo.  Who is now the holder and

23  owner of the patent.

24          THE COURT:  And Endo's rights are contained in an

25  agreement, right?

1          MS. JO:  Correct.

2          THE COURT:  Endo got its rights by an agreement with

3     JM.

4          MS. JO:  Correct.  And the patent purchase agreement

5     has been produced to Roxane by Endo in a form with some key and

6     confidential terms redacted out.  So from my perspective -- I

7     am not intimately involved in the Endo and Roxane litigation.

8     But the only purpose that the purchase agreement, the patent

9     purchase agreement can serve is to prove Endo's ownership of

10    the patent and to really have the right --

11         THE COURT:  To prove what?

12         MS. JO:  Endo's ownership of the '482 patent.  Because

13    not being a patent attorney --

14         THE COURT:  Ownership under what conditions?

15         MS. JO:  The PPA, the patent purchase agreement, or

16    the PPA, as redacted, provides the key conditions of the sale

17    of the patent to Endo.  That has already been produced to

18    Roxane.

19         THE COURT:  But it's been produced in redacted form.

20         MS. JO:  Correct.  But the unredacted portions bear

21    out the commercial terms of the deal between JM and Endo.  What

22    they are now seeking are grant-back licenses or the portion

23    which grants certain rights back to JM for the production of

24    the active agreement or, I guess, the raw material.

25         What they are claiming is something in that grant-back

1    license gives Roxane a license to produce the generic drug that

2    is at issue in the litigation.

3           Now, what possible license can an agreement between

4    Endo and JM give to Roxane who is not a party --

5           THE COURT:  Can I just interrupt you.  Sitting here as

6    a judge, I have questions in my mind just as a judge because

7    this was a very interesting series of events.  And the full

8    meaning of those events, it seems to me, Roxane should be able

9    to get --

10          MS. JO:  Your Honor, there might be an intellectual

11   curiosity as to the series --

12          THE COURT:  I am not talking about an intellectual

13   curiosity.  I'm talking about substantive issues.  I'm not

14   sitting here asking you about intellectual curiosity.  Do you

15   understand?

16          MS. JO:  I understand that, your Honor.  But what I do

17   not understand from Roxane's papers myself is how the chain of

18   events gives their defense any credence or has any bearing on

19   the infringement claim.

20          THE COURT:  How did they know when they don't have all

21   the materials?

22          MS. JO:  It is only here today that they are saying

23   that what they want is the unredacted.  What they also want,

24   your Honor, that is asked for in the subpoena are all

25   communications between Endo and JM regarding the transaction,

1   the sale of the patent.  They are also asking for internal

2   communications, JM internal communications regarding the sale

3   of the patent and the amendment to the supply agreement.  Why

4   JM sold the patent and under what business decisions were made

5   in the sale of the patent and why they sought the amendment to

6   the supply agreement really doesn't affect Roxane or Endo's

7   rights in any way.  They are looking for internal

8   communications of JM as well.  They are looking to depose Bill

9   Youngblood, who is the in-house counsel for JM who was the

10  point person or the key counsel for JM in the sale of the

11  patent.

12          Now, they are looking for a lot of things that are

13  proprietary and business decision making communications from

14  JM.  They are not just looking for materials.  They are not

15  just looking for the unredacted form of the PPA.  Even the

16  unredacted --

17          THE COURT:  The problem is, from Roxane's point of

18  view, they were dealing in a perfectly normal commercial way,

19  and all of a sudden a series of transactions occurs and they

20  are being sued for patent infringement.  So all of a sudden

21  normal commercial relationships get transformed into a patent

22  infringement claim.  They simply want to know how that

23  happened.  Am I right?

24          MR. PAR:  Yes.  We want to know the details of what

25  happened.

1        THE COURT:  This was not a little game that was

2    played.  This was a very serious thing.  They are now subject

3    to patent infringement claims and that was a very substantial

4    transformation from a commercial relationship into possibly an

5    infringement relationship.

6        We have taken a long time to discuss it.  The motion

7    to quash is denied.  Thank you very much.

8                              O0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25